ANGELINE E. PULLIS v. WILLIAM SOMER-
VILLE, Appellant.

Division One, March 31, 1909.

1. **RECORD MATTER: Negative Showing: Referee's Report.**
The issue of whether or not the referee took the oath required
by the statute is not raised by a mere recital in appellant's brief
that "the record does not show that the referee ever took the
oath of office" and by a short transcript and abstract in which
there is no mention of the referee's oath. A statement that "the
record does not show" does not mean that the record of the cir-
cuit court does not show the oath was not taken. In such case
the duty is upon the appellant to show in some unequivocal
way that the record in the circuit court fails to show the es-
sential fact.

2. ————: ————: ————: **Filing.** Where the referee took and
subscribed the oath before the clerk and left it with him, it was
filed. The indorsement of "filed" thereon by the clerk is only
evidence of the filing, and is not essential to the actual fact of
filing.

3. **INTEREST: Loan or Conversion: Accounting.** Plaintiff col-
lected $33,015.16 life insurance money on the death of her hus-
band, and placed it in the hands of her brother, the defendant.
She says it was loaned to him at six per cent interest. He
says it was placed in his hands to be by him held without in-
terest and invested for her. He gave her no note or mem-
orandum or receipt. He says he deposited it in the treasury
of a corporation of which he was president, to his own credit,
and it became mingled with his own funds; he checked against
it as his own money, and sometimes his account with the com-
pany was overdrawn. *Held,* that, upon his own testimony, he
appropriated the money to his own use, and is chargeable with
interest.

4. **ASSIGNMENT: Authority to Collect: Credit in Accounting.**
Defendant gave plaintiff a power of attorney to collect his share
of an estate in Ireland, but gave her no assignment, though re-
quested to do so, but in his answer to her suit for an accounting
pleaded that he had "assigned to her by way of power of at-
torney" that interest, and in his testimony he says he gave her
the power of attorney to collect his share of the estate and keep
it for herself. *Held,* that, although the power of attorney,
standing alone, was not equivalent to an assignment, yet taken
in connection with his plea and his evidence, and the allowance
to her of the amount in the account and her acquiescence there-

in, is sufficient; and although plaintiff has never collected the amount and might have objected to the allowance, the judgment of the circuit court was a transference of the fund to her, and as she acquiesced in the ruling of the referee, it will not be disturbed upon the insistence of defendant that the claim is now collectible, and there was no assignment and he should be permitted to collect it.

5. ACCOUNTING: Investment: Worthless Stock: Trust Fund. Even if defendant was plaintiff's trustee, having her funds in his hands to be invested according to his own judgment (which is more than the evidence shows), his investment of them in the stock of an insolvent mining company, by the transfer to her of his own stock, without her knowledge, was an abuse of the trust, and the item should not be allowed him as a credit when she sues him for an accounting.

6. ———: ———: Incumbered Lands: Unaccepted Deeds. Deeds to land upon incumbered real estate, tendered but not accepted by plaintiff, should be rejected in a settlement of the account.

7. ———: Rent: Implied Agreement to Pay: Married Woman. Where plaintiff was induced by defendant to move into a country place with a view to purchasing it if it pleased her taste, and defendant testified that there was no express agreement to pay rent, that it was only an experiment to see if his sister would be pleased to buy the place in payment of a debt which he owed her, but that it was his understanding that if she did not buy she would pay rent, and when asked why he did not mention the matter of rent earlier said it was because she was his sister, there is no implied agreement to pay rent from the mere occupancy, and the claim should be rejected in an accounting between them. Besides, even if an implied agreement to pay rent arises from the occupancy, as plaintiff was at that time married, it was the implied agreement of her husband as the head of the family.

8. ———: Unjust Allowance: No Exception. An unjust allowance made to appellant, to which respondent filed no exception, cannot be corrected on appeal; but it may be considered in connection with appellant's insistence that the amount should have been larger than was allowed.

9. ———: Reference: Separate Findings. A referee is not required to make a separate finding as to each item of an exhibit of over 300 items attached to the petition as a part thereof, where the whole exhibit is pleaded in a lump.

218 Sup—40

10. ————: **Acceptance of Deeds: Testimony as to Examination of Title.** Where defendant is sued for an accounting, and sets up as an item of credit certain incumbered property which he had caused to be conveyed to plaintiff, the deeds to which she asserts she did not accept, testimony of her attorney that, when the deeds were tendered, he examined the titles and found that the lots were incumbered, and that the tendered deeds passed the title from defendant through an insolvent to plaintiff, and that he had consulted a guarantee company to ascertain if it would guarantee the title, etc., and that thereupon he advised plaintiff not to accept the deeds, is competent, not for the purpose of showing that the deeds did or did not convey good title, but to show that plaintiff did not accept the deeds and did not act capriciously in refusing to accept them.

11. ————: **Worthless Stock: Testimony of Worthlessness After Transfer.** Where defendant transferred worthless stock of an insolvent mining company to plaintiff and seeks to obtain credit in her suit for an accounting at the face value of the stock as an investment for her, testimony tending to show thereafter the company's increased financial troubles up to the time she was informed of the transfer, may not be necessary, but it is pertinent as bearing on the question of the good faith of defendant in trying to impose his own worthless stock on her.

12. ————: **Compound Interest: No Exception.** Exceptions that "referee has erred in all his calculations of interest" and that "the referee has erred in his method of calculating interest, the same being contrary to the law of this State," refer only to the method of calculation, and does not raise the point that appellant has been charged with compound interest, and as no other exception nor the motion for a new trial raises the question of compound interest any error in that regard is not for review on appellant's assignment.

13. ————: ————: **On Money Converted.** Where defendant's confiding sister placed money in his hands to be invested according to his own judgment and he converted it to his own interest, he is chargeable with compound interest. The statute (Sec. 3711, R. S. 1899) which allows compound interest only on an express written contract therefor, does not apply to an accounting of a derelict trustee.

14. ————: ————: **Error on Face of Pleadings.** Plaintiff can recover only on the case made by her own pleading and proof, not upon that made by her adversary. So that where the referee charged the defendant interest on an open account for money placed in his hands as a loan, with annual rests, which constituted compound interest, the error, though not raised in the circuit court, will be corrected on appeal, but not at the cost of plaintiff.

Pullis v. Somerville.

15. ————: Interest: Method of Calculation.  The rule for counting interest in case of partial payments as laid down in Riney v. Hill, 14 Mo. 500, is approved.

16. ————: ————: Payments Made Through Year.  Where there were payments made by defendant at various dates in a year, but the referee does not give the dates, the Supreme Court, in trying to correct the error in calculation without the expense of a re-reference, will consider all the payments as having been made on the first of January of that year.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher*, Judge.

AFFIRMED.

*H. A. Loevy* for appellant.

(1) The referee erred in his finding that plaintiff did not accept deeds to the two Westminster Place houses.  (2) The referee's method of calculating interest is illegal.  Darling v. Potts, 118 Mo. 528. Especially as he has allowed compound interest which is not lawful unless specially contracted for in writing.  R. S. 1899, sec. 3711; Storage Co. v. Glasner, 169 Mo. 46; Riney v. Hill, 14 Mo. 500; Stoner v. Evans, 38 Mo. 461; Gas Co. v. St. Louis, 82 Mo. 202, 11 Mo. App. 78; Way v. Priest, 87 Mo. 182; State ex rel. v. Donegan, 94 Mo. 70; State ex rel. v. Shaw, 1 Mo. App. 519; Poulson v. Collier, 18 Mo. App. 605; James v. Hiatt, 80 Mo. App. 46; Call v. Moll, 94 Mo. App. 391.  Even where interest is by contract payable annually, it cannot be compounded.  Stoner v. Evans, 38 Mo. 461; Williams v. Carroll Co., 167 Mo. 16.  (3) The referee erred in deducting defendant's share of Sophia Crawford's estate, because: (a) Appellant never assigned same by formal instrument of writing.  (b) Appellant flatly refused to execute same when requested to do so several times.  (c) Respondent disdainfully refused during the hearing to recognize the assignment because it was speculative

and valueless. (d) Such an estate is not assignable at common law which prevails in Ireland, the *locus quo* of this property. (4) Referee erred in not allowing defendant credit for $5,000 value of Andes Mining Stock, because: (a) He had in fact assigned same to her shortly after company was organized. (b) He delivered certificates for same to her attorney promptly on latter's request therefor in 1900 in part payment. (c) Same was worth par (if not more) when he assigned it. (d) It was not a stock-jobbing scheme. (5) Referee erred in not making a special and distinct finding for or against allowance of each item of credit claimed by defendant. State ex rel. v. Peterson, 142 Mo. 534; Darling v. Potts, 118 Mo. 528; Edwards v. Garnhart, 56 Mo. 84. (6) Referee erred in not allowing defendant interest on amounts paid by him to plaintiff. The rule is either interest on both sides of the account or none to either side except on the balance when ascertained. Darling v. Potts, 118 Mo. 526. (7) Referee erred in not charging plaintiff for use and occupation of the country place she occupied for one year. R. S. 1899, sec. 4113; O'Fallon v. Boismen, 3 Mo. 405; Warne v. Prentiss, 9 Mo. 544; Edmonson v. Kite, 43 Mo. 176; Edwards v. Electric Co., 76 Mo. App. 618. (8) The record does not show that the referee took the oath in writing mandatorily required by statute. R. S. 1899, sec. 703.

*Rassieur, Schnurmacher & Rassieur* for respondent.

(1) (a) Although respondent's abstract shows that the referee took the oath required by the statute, it is not necessary that such fact should appear from a recital in the record. In the absence of proof or a statement to the contrary appearing in the bill of exceptions, it will be presumed that he duly complied with the provisions of the statute. Green v. Walker;

99 Mo. 73; Hemelreich v. Carlos, 24 Mo. App. 271; State v. Pollard, 14 Mo. App. 583. (b) If the referee had not been sworn, appellant would not be in a position to complain, since such failure to comply with the statute would have been a mere irregularity, and was waived by appellant's taking part in the proceeding before the referee, offering testimony and examining witnesses, all without objection. Bissel v. Warde, 129 Mo. 449; State v. Hope, 100 Mo. 355; State v. Davis, 186 Mo. 533. (c) This claim of error was not made in the proceedings before the referee, nor was it made in appellant's exceptions to the referee's report, in his motion for new trial or in his motion in arrest; it is therefore now too late to raise the question for the first time on this appeal. Carter v. Prior, 78 Mo. 224; Hemelreich v. Carlos, 24 Mo. App. 271; City v. Excelsior Brewing Co., 96 Mo. 677; Gorham v. Railroad, 113 Mo. 408; St. Louis v. Sieferer, 111 Mo. 662. (2) (a) The referee was not required to make a special and distinct finding on each of the 350 items forming the credit of $28,611.27, claimed by appellant in the first defense pleaded in his answer. Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. 489. (b) In the absence of any statute requiring specific findings, a general finding will be sufficient, unless the order of reference directs otherwise. Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. 489; Odd Fellows v. Morrison, 42 Mich. 521. (c) A referee is only required to make separate findings where there are several distinct causes of action stated in separate counts of the petition, or counterclaim. State ex rel. v. Peterson, 142 Mo. 535. (3) (a) The method of calculating interest adopted by the referee was correct. Frost v. Winston, 32 Mo. 494; Williams v. Pettigrew, 62 Mo. 472; In re Murdoch & Dickson, 129 Mo. 499; In re Estate of Camp, 74 Mo. 192. (b) Where a trustee mingles the money of the trust estate with his own, and uses it for his own benefit and in his own affairs,

and neither does, nor can, render a separate account of the estate and its earnings, he is properly chargeable with legal interest computed with annual rests. Perry on Trusts, sec. 471; Bobb v. Bobb, 89 Mo. 421; Williams v. Pettigrew, 62 Mo. 472; Cruce v. Cruce, 81 Mo. 676. (c) The rule for computing interest on legal demands, upon which partial payments have been made, does not apply to trustees' accounts. Cruce v. Cruce, 81 Mo. 691. (4) The referee did not err in allowing appellant credit for his interest in the Sophia Crawford estate. Appellant, in his answer, pleaded that he had assigned this interest to respondent, and he is bound by the allegations of his pleading. Oglesby v. Railroad, 150 Mo. 177; Kuhn v. Weil, 73 Mo. 215; Bruce v. Sims, 34 Mo. 251; Bensieck v. Cook, 110 Mo. 182; Wilson v. Albert, 89 Mo. 546. (5) Appellant's claim to a credit of $5,000, the alleged value of the mining stock which he owned, and which on February 22, 1898, he transferred on the books of the company to respondent, without her knowledge or consent, was properly rejected by the referee and the circuit court. (a) Appellant pleads in his answer that this sale was made at the "special instance and request" of respondent, but in his testimony he admitted that he had made this transfer without respondent's consent or knowledge, and that respondent did not learn of it until a short time prior to the institution of this suit. (b) Appellant, as trustee of the fund in his possession, had no power or authority to invest it in speculative stocks or in a business venture, the success of which had not become established. The investment was a gross breach of trust, and he is liable for all loss occasioned thereby. Perry on Trusts, sec. 454; Kimball v. Reding, 31 N. H. 374; King v. Talbot, 40 N. Y. 85; Drake v. Crane, 127 Mo. 106; Garesche v. Levering Inv. Co., 146 Mo. 445. (c) Where a trustee makes an investment in his individual capacity and fails to indicate promptly that the in-

vestment is on account of the trust in his charge, he will not be heard, after a loss or depreciation of the investment, to say that the investment was made in his representative capacity. State ex rel. v. Roeper, 82 Mo. 63; White v. Sherman, 168 Ill. 589; Perry on Trusts, sec. 452.

VALLIANT, J.—This is an action to recover moneys loaned by plaintiff to defendant. The first item mentioned in the petition is $3,500, a legacy under the will of Jason Crawford bequeathed to defendant in trust to pay the interest to testator's sister, Elizabeth Somerville, during her life, and the principal to the plaintiff at the death of Elizabeth; Elizabeth died September 22, 1883, and plaintiff then being entitled to the principal loaned it to the defendant at his request on the agreement that he would pay it to plaintiff on demand and eight per cent interest per annum. The petition also states that in November, 1894, she loaned defendant $25,000 which she at that time received from the Equitable Life Assurance Society of New York, $5,000 from the Massachusetts Mutual Life Insurance Company, and $3,015.16 from the Mutual Benefit Life Insurance Company. The petition admits the payment to her in 1893 of $1,400 on account of the loans and the same amount in 1895, and avers that in 1895, about four months after the life insurance moneys were loaned as above stated, defendant rendered the plaintiff an account of his indebtedness to her showing the amount due her for principal and interest $34,500, which sum he agreed and promised to pay on demand with interest at six per cent per annum. The petition then states that from November, 1894, up to and including September, 1899, the defendant paid plaintiff monthly, on account of the indebtedness, various sums ranging from $150 to $200 per month (she is unable to state it more accurately) and not any more. The prayer of the petition is for

a judgment for $34,500 and interest from — November, 1894, less such sums as the court may find the defendant may have paid on the account.

The answer is first a general denial, then follows an admission of having received from plaintiff $32,500 which it states defendant was to keep and invest for plaintiff. Then there is a statement that he paid out for her from time to time sums aggregating $28,611.27, of which he files a list marked "Exhibit A," and in addition thereto that he paid out for rent for her $1,000 a year from 1895 to 1900 inclusive, total $5,000; that in 1898 at her request he delivered to her fifty shares of stock of the Andes Mining Company for which he paid $5,000; that in 1899 he paid her amounts collected by him as rent for the house at Westminster Place in the city of St. Louis which he had purchased, $100 per month, $1,200; that in 1900 he deeded to her two houses in Westminster Place subject to mortgages, the equity in which by agreement was fixed at $12,000; that in 1900 "he assigned to her by way of power of attorney" to collect a portion of an estate in Ireland, valued at $4,000; that he gave sums to her sons at her request from time to time and paid out expense money for moving her family to New York and money sent her when she was in Europe, aggregating $1,000. Total payments alleged to have been made, $56,811.27, "largely in excess of what was received by him from her, for which with interest he prays judgment." The reply joins issue on all of those averments.

The suit was filed to the December Term, 1900, of the St. Louis Circuit Court; at the February Term, 1901, March 18, defendant filed his amended answer, as above, and by stipulation filed, the cause was on that day referred to George E. Smith, Esquire, to try all issues and report. The trial was long, running through several years apparently, and the referee filed his report January 15, 1906. The report is full, covering all the disputed facts, and covers 15 printed

pages. The referee in the conclusion of his report finds that there was a balance due the plaintiff at that date, January 15, 1906, of $35,167.98, for which sum with interest at six per cent per annum from that date he recommended that judgment in the plaintiff's favor be rendered. The defendant filed thirty-one exceptions to the referee's report, which were by the court considered and overruled; then followed motions for a new trial and in arrest, which were also overruled; final judgment for the plaintiff in conformity to the referee's report was rendered, and the cause comes here on defendant's appeal.

I. Before entering upon a consideration of the case on its merits we will notice a point made by appellant which if sustained would annul the whole trial and send the cause back to be tried all over again.

The point as stated in appellant's brief at page 139 is: "The record does not show that the referee ever took the oath of office mandatorily required by statute, Revised Statutes 1899, section 703, which invalidates his report and findings."

The cause comes here on a short transcript, supplemented by an abstract of the record filed by appellant, in which there is no mention of the referee's oath or any allusion to that subject. Appellant's statement in his brief is that "the record does not show that the referee ever took the oath." If by the use of those words appellant means to say that neither the short transcript nor the abstract filed by him shows that the referee took the prescribed oath, the statement is correct, but if he seeks to convey the idea that the record in the circuit court does not show that fact then he should have so stated. The record in this court is one thing, that in the circuit court is another; a fact may be omitted in so much of the record as appellant sees fit to bring here, yet appear in the circuit court record. Therefore, a party com-

plaining here that a certain act, which he deems essential to the validity of the proceeding in the circuit court, was not done, must show us either by producing a full transcript of the record of the circuit court or else show by his abstract, in some unequivocal form, that the record in the circuit court fails to show that fact. Appellant does not say that the record in the circuit court does not show that the referee took the oath, nor does his abstract in terms purport to show what the record in the circuit court shows on that subject, but he only says that "the record" does not so show, by which we understand that the record which he has brought here, that is, the short transcript and his abstract, do not so show.

What we have just said is well illustrated by the facts of this case; after appellant had presented his brief containing this point, respondent, as she had the right to do, filed a counter abstract in which, with other matters, she has set out the oath of the referee in due form taken before the clerk on the next day after his appointment and before he began the trial. Section 813, Revised Statutes 1899, gives appellant the right, if he does not concur in this additional abstract, to file his written objections thereto, and he has availed himself of that right and filed an objection, the substance of which is that the oath does not bear the file mark of the clerk. We notice the change in the attitude; first he said or sought to imply that there was no oath, but when the oath is produced he says it does not bear the file mark. There is no question as to the form and validity of the oath, it bears the signature of the referee and that of the clerk certified under the seal of the court, but it does not bear the file mark of the clerk, and for this reason appellant contends that the whole proceeding is a nullity.

Section 703, Revised Statutes 1899, Ann. Stat. 1906, p. 710, directs that the oath be taken "before

some officer duly authorized to administer an oath''
and that it ''be filed and returned with the award.''
Appellant's point is that it was not marked ''filed''
by the clerk, nor returned by the referee with his
report. The statute is broad enough to authorize the
oath to be taken outside of the court or outside of
the clerk's office, before a notary, or any officer author-
ized to administer an oath, and when so taken it
would likely remain in the possession of the referee
himself, and in that event it would be necessary for
him to return it with his report into court. But when
taken before the clerk and left with him it is filed;
the indorsement ''filed,'' by the clerk, is only evidence
of the fact. In Grubbs v. Cones, 57 Mo. 83, the court
said: ''The filing is the actual delivery of the paper
to the clerk without regard to any action that he may
take thereon.''

In Vogt v. Butler, 105 Mo. 479, among other ex-
ceptions to the referee's report, was one that it did
not appear in the record that the referee had taken
the oath, but on the hearing of the exceptions in the
circuit court proof was made by affidavit to the effect
that on the day the referee was appointed the oath
was administered to him by the judge of the court,
though no record or memorandum of it was made; upon
that proof the circuit court allowed the referee to
amend his report by interlining the statement that he
had taken the oath. In passing on that question this
court per GANTT, P. J., said: ''It is too late to object
to the referee's report on this ground after all this
acquiescence and consent. The subscribing of the oath
was directory. The taking of the oath was the sub-
stantive fact required by law; the subscribing and
filing it was intended to preserve the evidence of this
compliance with the law. The attorney for the plain-
tiff appeared before the referee, examined and cross-
examined the witnesses, and argued the cause before
the referee and made no objection at any stage of

the proceedings on account of the referee not having subscribed and filed an oath. We think the objection is wholly without merit.''

In the case at bar we have the oath duly subscribed by the referee and certified under the hand of the clerk and seal of the court, and lacking only the file mark of the clerk. Unusually long and apparently painstaking has been the trial, no hint of disqualification of the referee is made during the trial nor in the 31 exceptions to the report filed by appellant, nor in his motion for a new trial, or in arrest of judgment, but only when the cause reaches this court is the supposed infirmity noticed. There is no merit in that point.

II. The evidence shows that the plaintiff is the sister of the defendant. The trust in him of her money affairs is shown to have commenced before the death of her husband, as early as 1883, when she loaned him seven hundred pounds sterling. That was a sum that Jason Crawford had bequeathed to defendant to be held by him during the lifetime of the testator's sister Elizabeth, the interest to be paid to her, and on the death of Elizabeth the principal sum to be paid to the plaintiff. When the life beneficiary died it was agreed between the plaintiff and defendant that he would retain the money as a loan and pay her eight per cent interest per annum on the same. There is no dispute about that.

The plaintiff's husband died in 1894, leaving three life insurance policies payable to her, one in the Equitable for $25,000, one in the Massachusetts Mutual for $5,000, and one in the Mutual Benefit for $3,015.16. These several sums were collected in November, 1894, and placed in defendant's hands. The only difference between plaintiff and defendant as to those items is that she says they were loaned to him, while he contends that they were placed in his hands to be by him

held without interest and invested for her. The referee decided that point against the defendant and his decision is supported by the weight of the evidence. The only testimony in support of defendant's contention on that point was his own, and it was borne down by the testimony of the plaintiff herself and other witnesses, and by the course of dealing in which he paid her from time to time interest on these sums, and sometimes cautioned her that she was encroaching on the principal. But it is really of not much consequence what the original understanding or agreement was on that point, except as it may bear on an investment he claims to have made for her in stock of a mining company which owned or claimed to own certain mining property in South America, which alleged investment will be hereinafter again referred to and considered. But whatever may have been the original understanding, a very significant fact stands out concerning these life insurance moneys, that is, it was all placed in the hands of the defendant by his trusting widowed sister, and he gave her no note or memorandum, not even a receipt for the money. More implicit confidence could not have been shown than the plaintiff showed of her faith in the defendant; he was her brother and she trusted him with her all. What did he do with it? According to his own statement as a witness he deposited it in the treasury of a corporation of which he was then president, called the Missouri Glass Company, to his own credit, and it became mingled with his own funds; he checked against it as his own money, and sometimes his account with that company was overdrawn. That was his own testimony. If, therefore, as he now claims he was only custodian of the money, he made a use of it that he had no right to make. After thus appropriating it to his own use he cannot complain if he is charged with interest.

The evidence shows that in January, 1895, the plaintiff requested defendant to give her a statement of account showing the amount of his indebtedness to her and he accordingly gave her a little book containing the account as he reckoned it, which embraced the Jason Crawford legacy $3,500 and the several life insurance sums, and, with items of interest on one side and credits on the other, showed a balance of something over $34,500 due the plaintiff on January 1, 1895. This little book is referred to by the witnesses as the "red book," it being bound in red leather. When plaintiff was leaving St. Louis to go to New York in 1898 she requested the defendant to continue the account down to date, and for that reason she sent the red book to him, and though several times requested he never returned the book to plaintiff or gave her any statement of the account. Defendant in his testimony denied that book was returned to him, and denied that it showed a balance of $34,500 in plaintiff's favor, but he did not say what the balance was. A brother of the plaintiff and defendant testified that he was present when Mrs. Pullis asked defendant to return the red book to her, saying it was the only thing she had to show the account between them, but that defendant stated that he had returned the book to her; this she denied, saying to him that she had sent to him for it several times and he had not returned it. The preponderance of the evidence is that the book was returned to defendant with the request that the account be brought down to date and that he never returned it and never rendered any other account. The brother of plaintiff and defendant above mentioned, also testified that at another time he told defendant that plaintiff had told him that she had asked defendant several times to give her a statement of the account but that he had not done so, and witness asked defendant why he had not done so, and defendant replied that he would not do so for the reason that if he gave

her a statement it would admit of her taking a judgment against him at once.

Sufficient appears to put it beyond question that the defendant, at the several dates mentioned in the petition, received the several sums of money as in the petition stated and the only questions left to be considered relate to the credits to which the defendant is entitled. Before going into the smaller items we will notice some of the larger amounts which defendant claims as credits.

(a). In August, 1900, defendant gave plaintiff a power of attorney to collect his share of the estate of an aunt of theirs, Miss Sophia Crawford, in Ireland, and he claimed in his answer to be entitled to a credit for that share. We infer from the abstract that at the time he gave this power of attorney the aunt was living but has since died. He never before this suit gave the plaintiff an assignment of that interest and when requested refused to do so. But in his answer to the petition he said that he ''assigned to her by way of power of attorney'' that interest, and in his testimony he said that he gave her the power of attorney to collect his share in that estate and keep it for herself. Upon that pleading and evidence the referee allowed the defendant $3,000 as a credit on that account. Although the power of attorney, standing alone, would not have been equivalent to an assignment, yet taken in connection with defendant's plea, and his own evidence and the allowance to him of that sum in the account, and the plaintiff's acquiescence in the allowance, it is sufficient. The plaintiff has never collected this item, and she might well have objected to the allowance, but as she has acquiesced in the ruling of the referee, the ruling will stand and the judgment of the circuit court on the ruling was a transference of the title in that fund to the plaintiff.

The defendant's attitude or attitudes in reference to this item are not consistent. In his answer he pleads

this item as one for which he is entitled to a credit of $4,000, as a payment on the account, and in his testimony he said that he gave the plaintiff the power of attorney with the agreement that she was to collect it and keep it. At the trial he insisted that he had, in that way, assigned that item to the plaintiff and was entitled to a credit of $4,000, which he said his share in that estate was worth. But Mrs. Pullis after the aunt's death went to Ireland to look after that very matter and she there ascertained that his share when the estate would be settled would be $3,000, and she so testified, and the referee found that to be the value and gave defendant credit for that sum. But the defendant now says in his brief, page 111, that the referee erred "in deducting defendant's share" in that estate at all, because, he says, he never did assign it to the plaintiff. The power of attorney was given while the aunt from whom the inheritance was expected was living, and she was living when the answer was filed claiming that as a credit, but before the trial ended the aunt died, and then the prospect of collecting his share of the estate became more real, and he now insists that that item should not go into this account at all, he would now apparently rather collect that share himself and owe the plaintiff that much more. We think the referee took the just view of that transaction.

(b). Just before this suit was commenced the defendant claims to have invested $5,000 for the plaintiff in the purchase of 50 shares of the Andes Mining Company, a corporation of which he had been president. The only property that corporation ever had was an undeveloped mining property in South America. The evidence shows that at the time of the alleged "investment" the corporation was entirely insolvent and, as the referee found, the stock was "a liability rather than an asset." This was said in allusion to the condition of the company's affairs as

shown by the evidence; the mines were yielding nothing, expenses had accumulated, debts incurred, assessments were being solicited from unwilling shareholders, efforts were being made to induce others to buy stock to raise funds to develop the mines, but the efforts were unsuccessful. This transaction the defendant conducted all within himself; he was the owner of 81 shares and was president of the company and he transferred 50 of his own shares to the plaintiff, as he testified, for $5,000, in cash; this he said he did in 1898 and it was not until nearly two years thereafter that he informed Mrs. Pullis, the plaintiff, of the "investment," she had never heard of it before and never consented to it when she was informed of it. The first information the plaintiff received of the alleged transfer of this stock to her was in 1900 after she had placed her cause in the hands of her attorneys and after her attorneys had demanded of defendant a settlement. On the trial before the referee defendant was asked if he had instructions from Mrs. Pullis to make the purchase for her, he answered, "No, I-had not; it was not necessary." That answer was on the theory that he was trustee for the plaintiff holding her funds to be invested according to his own judgment. Even if he had not, as his own evidence showed he had, already converted the whole alleged trust fund to his own use, even if he had her money then in a separate treasury for her use, his investment of $5,000 of her money in the purchase of his own worse-than-worthless stock would have been set aside in a court of equity as an abuse of the trust. The referee did not err in rejecting that item.

(c). The referee in his report says: "The defendant also claims a credit of $12,000, the alleged value of an equity in two houses and lots on Westminster Place transferred to the plaintiff by one Hen-

derson at his request. I find from the evidence that the deed for this property was not accepted by the plaintiff. She did agree through her attorney to take the property if the title was such that the loan then past due, could be renewed. An examination was made, and the examiner reported a large number of suits and judgments in existence which endangered the title. On this report a loan was refused, unless a guaranty of the title was procured. On application for a guaranty to a trust company, that was refused, and the deed from defendant's transferee was tendered back, and is again tendered in the reply. On this evidence I find that the deeds for the property were never accepted, and that defendant is not entitled to the credit he claims on that account."

The testimony shows that after the plaintiff's case was in the hands of her attorneys and the suit was either already begun or was imminent the defendant offered to the plaintiff deeds to these two Westminster Place houses. This occurred in the office of plaintiff's attorney and defendant testified that he handed the deeds either to Mrs. Pullis or to Judge Rassieur, her attorney, he did not quite remember which. Judge Rassieur testified that when the deeds were offered he agreed to accept them for Mrs. Pullis provided after examination he found the title to be satisfactory; that he afterwards made the examinations and was not satisfied with the title and refused to accept the deeds, he tendered them back to defendant who refused to take them, tendered them also in plaintiff's reply and at the trial. We will refer to the evidence on this point again when we come to consider some objections offered to it by defendant at the trial. We are satisfied the referee did not err in refusing to give defendant credit for those houses in the account.

(d). Appellant assigns as error the refusal of the referee to allow him $1,000 credit for rent of a place in the country called the O'Day Place. There

'was no claim in the answer for such a credit, and so far as the evidence shows the first time that claim was advanced was in February, 1905, long after the commencement of the trial before the referee.  The evidence shows that the family moved on the place in 1891 on the suggestion of defendant in the following letter written by him to the plaintiff, dated May 4, 1891: "Dear Sister: The thought occurs to me in view of the many charms of the O'Day Place and your love for a home to offer it to you.  The balance coming to you and the difference for a gift will make it yours.  I will advance what is necessary to build a house to your taste.  Don't say no to this until you and Gus will come out with me and look and talk it over, as I feel this suggestion will do you good.  Yours, W."  The "Gus" mentioned in the letter was the plaintiff's husband.  As bearing on the question of the defendant's indebtedness, we must note that that occurred before the defendant had received the moneys paid by the life insurance companies, and he had then only the Jason Crawford legacy, $3,500.  The Pullis family remained on the place several months, the dwelling house having been destroyed by fire before they moved out there; they lived in the barn for several months, and, not finding the place to their taste, they moved back into the city.  Defendant does not claim that there was any agreement to pay rent, it was only an experiment to see if Mrs. Pullis would be pleased to buy the place, but he says it was his understanding that she would pay rent, and when asked why he had not mentioned it earlier he said it was because she was his sister.  Appellant now insists that although there was no express agreement to pay rent, yet the law will imply such an agreement by the mere fact of occupancy.  Sometimes the mere fact of occupancy will raise an implied assumption to pay rent, but not always so, and never so when all the circumstances repel the implication.  The circum-

stances shown in the evidence in this case do repel such an implied promise.  Besides, if there was nothing else in the case to be considered than the mere fact of occupancy and if from that fact an implied agreement to pay rent arises, then, it is the implied agreement of the husband of the family and not of the wife.  The referee was right in his judgment on that item.

(e)  Defendant insists that the referee should have allowed him $2,800 credit for premiums he had paid on the life insurance policies during the lifetime of the plaintiff's husband, whereas the referee allowed him only $1,400 on that account.

The evidence shows that the plaintiff's husband was a man of business affairs and reputed wealth. While he lived he provided for his family and there was but little if any occasion for Mrs. Pullis to draw on the Jason Crawford legacy fund then in the hands of the defendant.  She testified that in addition to the fund in the defendant's hand she had from another source an income of $40 a month.  But the testimony of defendant shows that he did pay some of the premiums on these policies, that he did so at the request of Mr. Pullis, and did not mention the fact to Mrs. Pullis because Mr. Pullis had requested him not to do so, and defendant's testimony also shows that he took Mr. Pullis's notes for the premiums so paid, two of which notes covering the last two largest premiums were produced in evidence attached to the receipts. As the payment of these premiums was a matter between Mr. Pullis and the defendant concerning which Mrs. Pullis was purposely not informed, the only evidence in relation to them available at the trial was that of the defendant himself.  The receipts from the insurance companies were all made in the name of Mr. Pullis and the evidence shows that when the policies were delivered to the defendant for collection after the death of Mr. Pullis many of the receipts were fold-

ed in the policies, and besides he had access to all Mr.
Pullis's papers; therefore, unless the defendant had
kept a more careful account of his dealings with the
plaintiff's funds than his own evidence shows that he
did keep, he may have been mistaken and have suppos-
ed that he had paid more premiums than he did pay.
He testified that he took notes from Mr. Pullis for
premiums paid other than the two produced, but he
did not exhibit them at the trial.

The only premium paid by defendant that the
evidence shows that the plaintiff had any information
about was one paid in the last year of her husband's
life, which she testified her husband asked her to
allow the defendant to pay out of the Jason Crawford
legacy and she consented; that premium, she testified,
was about $1,400; on proof at the trial it was shown
to be $1,381.83. The referee gave the defendant credit
for $1,400 on that account, which was fully as much as
the defendant's own evidence showed that he had any
reason to claim and really that much more than in
strict legal right he was entitled to, because the pre-
ponderance of the evidence indicates that defendant
had already taken credit in the "red book" for all the
premiums that he had paid, together with doctors' bills
and funeral expenses and other expenses incident to
the last illness of Mr. Pullis, which were proper
charges against the estate of plaintiff's husband and
not against her. But defendant insists that the plain-
tiff in her petition admits that he is entitled to two
items of $1,400 each on this account. The clause in
the petition on which this claim is founded is in the
paragraph relating to the loan of the Jason Crawford
legacy and is as follows: "Plaintiff states that in the
year 1893, the defendant paid about fourteen hundred
dollars at plaintiff's request on account of said loan,
and in the year 1894 defendant paid the further sum of
about fourteen hundred dollars at plaintiff's request
on account of said loan." The petition does not say

that those two $1,400 items were premiums on the policies or that either of them was, and the evidence does not show that to be the fact. The referee found that the second one, the one paid in 1894, was for the premium that plaintiff in her testimony admitted she had authorized to be paid out of her Jason Crawford legacy and that accords with the evidence. The first $1,400 mentioned doubtless referred to other payments made prior to the death of plaintiff's husband. The account stated in the "red book" was made out by the defendant and given to the plaintiff, as his own statement of his indebtedness to her, on January 1, 1895, and the preponderance of the evidence is that the balance there shown on that date was something over $34,500, but less than $34,750. The plaintiff testified in reference to the account in the red book: "The funeral expenses, doctor bills and other expenses of last illness of my husband and family expenses up to January 1st and insurance premiums were taken out and left a balance of $2,800 due on the note and interest. The note in 1888 was for $3,900 and drew eight per cent interest." Those of plaintiff's witnesses who saw the "red book" also stated that it contained insurance premiums. The defendant himself testified: "It is my impression that I entered all the payments made by me for insurance premiums in the red book, but I won't testify exactly." If the referee had taken the balance shown by the red book as an account stated and had heard evidence only as to items occurring after that date he would have been entirely justified in so doing and if the plaintiff were here appealing she might insist on eliminating the items of credit allowed prior to that date. We are not overlooking the fact that defendant denied the testimony of the plaintiff and of her witnesses as to the contents of that red book, but he stands alone on that point. He also denied that the book had been returned to him to bring the account down to date, yet his brother testified that

he was present on one occasion when Mrs. Pullis asked
him to return the book to her, saying that it was the
only writing she had to show how the account stood,
whereupon the defendant replied that he had already
returned it to her, which she strenuously denied, and
subsequently defendant told the same brother that
the reason he did not return the book to Mrs. Pullis
was that if he did so she could take a judgment against
him at once. Thus we find him at one time denying
that the book had been returned to him, then saying
that he had returned it to the plaintiff, and afterwards
that the reason he had not returned it to her was that
had he done so she could at once take a judgment
against him. If therefore the referee concluded that
the defendant's statement as to what the book con-
tained was less reliable than the statements of the
plaintiff and other witnesses who saw the book we can-
not say that he was wrong in his judgment. We think
that in allowing the defendant $1,400 on account of
premiums paid, the referee allowed him that much
more than he was strictly entitled to, but as the plain-
tiff was willing to allow it, the referee was justified in
doing so, but we also hold that the referee did not err
in not allowing him the other $1,400 now claimed.

(f). Defendant paid the rent on the house in
which the plaintiff was living at the time of her hus-
band's death and has charged that as cash paid her in
his account. The referee has allowed that item. De-
fendant had three vacant houses, two of which were
in Westminster Place, and the other on Washington
Avenue, all of which he desired to sell. In July, 1895,
plaintiff moved into one of the Westminster Place
houses with the agreement, as she testified, that she
would take care of the houses, show them to prospec-
tive buyers, and assist in the effort to sell them.
Nothing was said about rent at that time, but after one
of the houses was sold and the one adjoining the house
in which she was living was rented, she told the de-

fendant that she would pay him the same rent he was to get from the other house, $60 a month, and he agreed to that. In his account he has charged this rent as cash paid to Mrs. Pullis and the referee has allowed him those items in the account, but in 1899 the plaintiff rented the house furnished with her own furniture at $100 a month, which defendant collected and remitted to her and charged her as cash the full sum of $100 per month, while at the same time he was renting the adjoining house exactly like it but unfurnished for $60 a month. The referee concluded that the extra amount of rent collected for the furnished house was due to the fact that it was furnished and therefore allowed defendant only $60 a month for the house. Defendant complains of that ruling. We think the referee was right.

III. In addition to the items above discussed the defendant has filed as "Exhibit A" to his answer a list of over three hundred items which he claims as credits and which aggregate $28,611.27 and which if added to the items already discussed and claimed by him would make a total of $56,811.27.

We do not consider it necessary to discuss and set out in this opinion the evidence bearing on each of those three hundred items. Some the referee has allowed and some he has not allowed; we have read all the evidence shown in the two abstracts bearing on the alleged payments and we find no fault with the referee's finding. The only specific complaint appellant now makes in reference to those three hundred items is that the referee does not make a separate finding on each of them. Appellant in his brief says he cannot know from the report which items were allowed and which were not allowed. The referee was not required to make a separate finding on each of those items, they were not set out in the pleadings in such a manner as to call for a separate finding as to each item. On

each item specially pleaded in the answer the referee has made a separate finding, but these three hundred items are pleaded in a lump and the referee would have been entitled to treat them in a lump. This is the way in which these items are pleaded in the answer : "That at the instance and request of plaintiff, defendant paid out from time to time various sums of money for her and at her request on account as appears by detailed statement attached hereto made a part hereof and marked 'Exhibit A' aggregating the sum of $28,611.27." An exhibit is no part of the pleading and *per se* tenders no issue calling for a separate verdict, but the exhibit in this case is so vague and indefinite that it does not give the trier of fact an intelligent understanding of what the various items mean. Defendant's testimony was to the effect that many of the cash items he paid to plaintiff, many to her sons or daughters, and many were for rent and other things, but the exhibit does not show under which of those heads the various items fall. The referee took the evidence of the defendant and the plaintiff and her children on all of these items and made a finding for each year of the aggregate of the payments made or credit earned.

Appellant relies on State *ex rel.* v. Peterson, 142 Mo. 526, to sustain his demand for a finding on each item; but that case does not sustain that contention. That was a suit on an official bond and there were a large number of counts in the petition, the only thing the court decided on this question was that there should have been a finding on each count. The court said: "When several distinct causes of action are stated, the same reasons for separate findings would seem to apply to a referee as to the verdict of a jury." There the court likens the finding of a referee to the verdict of a jury; suppose a plaintiff should sue in one count on an account for goods sold from time to time, run-

ning through a period of a year or more, must the jury render a separate verdict on each item?

Defendant testified that he never kept an account of the items of moneys paid out by him to the plaintiff or to her children, he only had loose receipts or memoranda which did not include all, and for the rest he relied on his memory, for a large number of the items claimed, he had nothing to show. He testified: ''I did not keep any system of accounts at all; as the drafts or requests would come in I would either give the money from my pocket or go down to the cashier of the Missouri Glass Company and get the cash from my account there for her. Q. Did you keep any system of books in connection with this fund? A. No, I did not.'' This was the business conduct of a man of experience in business affairs, who was at the time the president of a large mercantile corporation. According to his testimony the only account that would show any of the items of this business was his own personal account in the books of the Missouri Glass Company. He was asked to obtain a copy of that account from the books of the company and present it to the referee, but he never complied with the request. While testifying on this point he was asked by Judge Rassieur, the plaintiff's attorney: ''Will you give me authority to ask for a copy of that account [defendant's account on the books of the Missouri Glass Co.] from the time of the deposit of Mrs. Pullis' money, and thus enable me to obtain such copy? A. No. There are different reasons for my refusal; in the first place I have no right to authorize that authority; the second, there is nothing in that account that will be of any utility to you in the world.'' Defendant's reliance to sustain his claim on every disputed item was his own uncorroborated testimony. If he had been an inexperienced man in business affairs, some excuse might have been indulged for this loose method of handling this business, but under the circumstances his method was not

calculated to inspire confidence. We think the referee took a very just and equitable view of the controversy and we find no fault with his conclusions as to the facts.

IV. Appellant contends that the referee admitted illegal testimony.

It was in evidence that when the defendant handed the deeds to the Westminster houses to Mrs. Pullis or to Judge Rassieur (defendant did not quite remember which), Judge Rassieur told him he would take the deeds and hold them until he could examine the title and if satisfactory would accept them for the plaintiff. Judge Rassieur testified that on his investigation he found that the title to the property had recently been transferred by defendant to an insolvent brother-in-law of defendant for a nominal consideration, and that at the time of that transfer suits were pending against the defendant which soon thereafter ripened into judgments against him; that Judge Rassieur went to a title guarantee company to see if it would contract to guarantee the title but the company declined to do so, then he tendered the deeds back to defendant who refused to accept them.

In that connection the plaintiff also introduced in evidence a number of court records showing judgments against defendant and in connection with those records introduced a certified copy of the deed from defendant to his brother-in-law, for the purpose of showing the comparative dates of the deed and the judgments. The deeds that were offered by defendant to the plaintiff were the deeds of this brother-in-law of defendant. All that evidence went in over the defendant's objection and he now insists that it was error. If the issue on trial had been the title to the property, the evidence, at least that part of it in which the witness stated the result of his investigation and his conference with the title examiners, and the title guarantee company, would have been incompetent. But that was not the

issue. The question was did the attorney investigate for the purpose of satisfying himself so as to be able to advise his client? He held the deeds to be retained or returned according to what his investigation would satisfy him as to the title. The information he obtained may have been incorrect, but if it satisfied him that the title was insecure he had the right to act on it in advising his client. His duty as a lawyer seeking information on which to advise his client did not demand of him to do more than he did. The evidence offered only tended to show that he had not arbitrarily or capriciously refused to accept the deeds, but had made a faithful examination and decided the question that was left with him to decide. On the examination if he became satisfied that a deed made by defendant then in the toils of law suits, to an insolvent brother-in-law, for a nominal consideration, and a transfer of the title by the brother-in-law to a sister of defendant would probably involve her in a law suit with the defendant's creditors, he had the right to advise his client to decline to take the deeds. The referee was not passing judgment on the title to the property, but only on the question of whether or not the plaintiff had accepted those deeds, and this testimony only went to show that after the attorney had investigated the matter and satisfied himself as to the title he advised his client not to accept the deeds and she acted on his advice. There was no error in overruling the objection to that evidence.

There was also evidence tending to show the financial condition of the Andes Mining Company, not only at the date of the alleged "investment" in 1898, but also down to the time it was brought to the plaintiff's knowledge in 1900, the tendency being to show not only that the condition was bad in 1898, but that it grew worse as the time went on. The appellant contends that the showing should have been limited to the date of the alleged investment. The defendant's own

testimony in effect though not in terms shows that the
stock was worthless when he claims to have transferred
it, and he made no effort to show that it had improved
since.  If it was worthless in 1898 it will be presumed,
until the contrary is shown, to have continued worth-
less, and although the evidence tending to show the
corporation's increased financial troubles may have
been unnecessary, as bearing on the question of the
real value of the stock, it was pertinent as bearing on
the question of the good faith of the defendant in try-
ing to impose fifty shares of his own worthless stock on
the plaintiff for $5,000 in cash.

V.   One more point of appellant remains to be
considered.

In his brief he complains that he has been charged
with compound interest, that the referee has erred in
calculating interest, and in his method of calculating
interest.  It does not appear from the abstract that
the question concerning compound interest was pre-
sented to the circuit court, at least not so in express
terms.   In his thirty-one exceptions to the referee's
report and thirty-two grounds in his motion for a new
trial, no mention is made of compound interest.  The
nearest he came to raising that question in the circuit
court was in Exceptions 6 and 7 which are also repeat-
ed in the motion for a new trial.   Exception 6 is:
"Referee has erred in all his calculations of interest."
That only means that the referee was at fault in his
mathematics.  Exception 7 is: "The referee has erred
in his method of calculation of interest, the same being
contrary to the law of this State."   That only refers
to the method of calculation.  That that was what the
exception was designed to mean is shown by another
paragraph in appellant's brief, page 136, where it is
said: "The error lies as shown, *supra,* in not calcu-
lating interest to date of first payment, deducting pay-
ment, calculating interest on remainder to date of next

payment, deducting payment and so on." Another method of calculating interest is indicated in appellant's Exception 18, which is that the referee ought to have allowed defendant interest on each item of his credits from the date of payment. So far as the record shows those two methods include all the complaint that the defendant made in the circuit court on the question of interest and neither of them refers to compound interest.

Where there are mutual running accounts interest may be given on both sides until a balance is struck, but when the balance is struck, the interest runs only on the balance. When one makes a part payment on a debt he owes he is not entitled to have interest to run on the money he paid, in such case interest runs only on the balance due on the debt.

The referee did charge the defendant interest with annual rests, which constituted compound interest. If defendant should be taken at his own word, both in his pleading and his testimony, he would be liable, in the discretion of the trial court, to be charged with compound interest, because, according to his statements, this money was not loaned to him at all, but was placed in his hands by his confiding sister to be invested for her as in his judgment would be best for her and thereupon he immediately deposited it to his own credit and used it in his own business. The statute, section 3711, Revised Statutes 1899, which allows compound interest only on express written contract therefor, does not apply to the accounting of a derelict trustee. [Cruce v. Cruce, 81 Mo. 676; Bobb v. Bobb, 89 Mo. 411; *In re* Murdoch & Dickson, 129 Mo. 488.]

But the plaintiff can recover only on the case made by her own pleading and proof, not that made by her adversary. And although the point was not raised in the circuit court yet as it is an error appearing on the face of the record it should be corrected here; but the correction should not be made at the cost of the plain-

tiff, because the presumption is that if the attention of the trial court had been drawn to it the error would have been corrected there, or plaintiff would have been allowed to enter a *remittitur* to the extent of the excessive interest.

The correct method of counting interest in case of partial payments is stated in Riney v. Hill, 14 Mo. 500, as counsel for appellant rightly contends. The rule as there stated has been frequently referred to and approved by this court; it is this: "Interest is first to be calculated on a demand up to the first partial payment —then add the interest to the principal and deduct the payment therefrom, then cast interest on the remainder to the second payment, add the interest to the remainder and deduct therefrom the second payment, and so on until the last partial payment, unless in any case the interest up to any payment shall exceed the payment, in which case such payment is to be deducted from the interest, and the excess of the interest is to be carried forward, without casting interest thereon, to the next payment that will discharge the excess."

Appellant also contends that the referee should have calculated the interest up to the date of each payment instead of adding together at the end of the year all the payments made at different dates in the course of the year and casting the interest to that date. Although that method would have given the referee a long and wearisome task yet in strictness it is the method he ought to have pursued. And since the account as stated by the referee does not give the several items and respective dates, but gives the aggregate of all the items paid during the year, there is no other way to correct the error except to give the defendant credit as if he had made all the payments on the first day of January of the year in which they were paid; by so stating the account the defendant would gain more than if the method of calculating the interest up to the date of each item as contended for by him had been strictly

pursued, but unless that advantage be given him the parties would be involved in a re-reference which would cost more than the small difference in interest would be, to say nothing of the extension of the time of this already unusually long litigation.

Calculating the interest by the method above quoted from Riney v. Hill, 14 Mo. 500, and giving the defendant credit on the first day of January of each year for all the payments thereafter made by him during that year, the true balance due the plaintiff from defendant at the date of the referee's report, January 15, 1906, is $33,518.63, instead of $35,167.98. We therefore deduct the excess of interest, $1,649.35, from the balance shown by the referee's report, leaving the correct balance $33,518.63, for which sum with interest at six per cent per annum from January 15, 1906, the judgment is affirmed.

All concur.